13

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF TEXAS**
**BROWNSVILLE DIVISION**

United States District Court
Southern District of Texas
FILED

NOV 2 6 2002

Michael N. Milby
Clerk of Court

ROSA M. FLORES                    *
                                  *
vs.                               *        CIVIL ACTION No. B-02-146
                                  *
JAMES W. ZIGLER, Commissioner for *
the Immigration and Naturalization *
Service                           *

### DEFENDANT'S MOTION TO DISMISS AND
### ALTERNATIVE MOTION FOR SUMMARY JUDGEMENT
### WITH SUPPORTING MEMORANDUM OF LAW

TO THE HONORABLE JUDGE OF SAID COURT:

Defendant, JAMES W. ZIGLER, Commissioner for the Immigration and Naturalization Service, moves to dismiss Plaintiff's suit for failure to state a claim and want of subject matter jurisdiction. Rules 12(b)(1) and (6) of the FRCP. Alternatively, to the extent that this Court may have to rely on matters outside the scope of the pleadings herein, the Defendant herein moves for summary judgement. See, Rule 56 of the FRCP.

In support of this motion, the Defendant submits the following for this Court's consideration:

### 1. *Background*

Plaintiff filed this lawsuit on July 29, 2002. In her complaint, Plaintiff alleges that she was the victim of sex discrimination while employed by the Defendant as a Border Patrol Agent. *See Plaintiff's Original Petition, paras. 9 and 10.* Plaintiff claims that this discrimination resulted in retaliation for involvement in a prior EEO activity that led to her "constructive discharge" as a Border Patrol Agent. *Id.* In addition, Plaintiff claims that the Defendant and his subordinate staff members committed various common law torts such as assault and battery, invasion of privacy, fraud and misrepresentation.

Defendant's records show that Plaintiff entered on duty as a United States Border Patrol Agent on July 16, 2000. *Defendant's Ex. A-1.* Plaintiff graduated from the Border Patrol Academy at Charleston, S.C. on or about November 29, 2000. *Id.*

Plaintiff began working at the Weslaco Station on December 4, 2000. *Id*. On February 2, 2001, Plaintiff resigned from the Border Patrol having never made any complaints of discrimination to her supervisors. *Defendant's Ex. B.*

On February 5, 2001, Plaintiff began working as a Border Patrol Assistant at the Harlingen, Texas station. Soon thereafter, Plaintiff asked the Chief of the Border Patrol McAllen Sector, Jose Garza, to be reinstated to her position as a Border Patrol Agent. The Plaintiff's request was granted; however, Plaintiff declined the position because it would require her return to the Weslaco Station. Plaintiff preferred to be assigned to the Harlingen Station; unfortunately, it was determined that the Weslaco Station was in more need of Border Patrol Agents than the Harlingen Station. *Defendant's Exs. C and A-1.*

It was also about this time that Plaintiff first started to make complaints about an allegedly hostile working environment at the Weslaco Station. As a consequence, a "Management Inquiry" regarding the Plaintiff's allegations was conducted by Assistant Patrol Agent in Charge (APAIC), San Juanita Luna. *Defendant's Ex. A-2.* After interviewing several agents and supervisors, APAIC Luna was unable to substantiate any of the more serious allegations made by the Plaintiff, although she did have some recommendations to improve agent safety during the night or midnight shifts. *Defendant's Ex. A-3.*

In June 2001, after having made an informal complaint through the EEO process, Plaintiff exercised her right to mediate. *Defendant's Ex. D.* In June of 2001, Plaintiff went to mediation and there was no resolution of her complaints.

Plaintiff continued to work at the Harlingen Station as a Border Patrol Assistant, mostly doing clerical duties. However, in August of 2001, the Plaintiff submitted her resignation. *Defendant's Ex. E.* In August 2001, Plaintiff submitted a Formal Complaint through the EEO process alleging that she was the victim of sexual discrimination and reprisal. *Defendant's Ex. F.* For reasons unknown at this time, no action was taken on the Plaintiff's Formal Complaint.

Plaintiff's complaint also alleges a number of fraud and common law tort allegations against the Defendant and his subordinates. And, although Plaintiff asserts

2

that all these torts were committed by the Defendant and his subordinates while acting within the course and scope of their employment with the United States, no administrative claim for recovery of injuries has ever been submitted to the United States as required under the Federal Tort Claims Act. *Defendant's Exs. G and H.*

### 2.    *Argument*

### A.    *All Non-Title VII Claims are Preempted by Title VII and Should be Dismissed.*

Both the Supreme Court and the Fifth Circuit have held that "Title VII provides both the exclusive cause of action and the exclusive remedy for federal employees who wish to assert claims of employment discrimination." *Perez v. F.B.I.,* 71 F.3d 513, 515 (5th Cir. 1995) ( citations omitted); *Jackson v. Widnall,* 99 F.3d 710, 716 (5th Cir. 1996); see *Brown v. General Services Administration,* 425 U.S. 820, 835 (1976) ("§ 717 of the Civil Rights Act of 1964, as amended, provides the exclusive judicial remedy for claims of discrimination in federal employment").  This holding that Title VII preempts other causes of action based on the same underlying facts warrants the dismissal of any other claims arising out of the same set of facts, including Plaintiff's tort claims.  See, e.g. *Perez,* 71 F.3d at 515 (Title VII bars plaintiff's *Bivens* claims); *Hampton v. I.R.S.,* 913 F.2d 180, 182-83 (5th Cir. 1990) (5th Cir. 1990) (Title VII bars plaintiff's tort claims); *Gergick v. Austin,* 997 F.2d 1237, 1239 (8th Cir. 1993) (Title VII bars plaintiff's tort claims);  *Cf. American Postal Workers Union, AFL-CIO v. United States Postal Service,* 940 F.2d 704, 708 ( D.C. Cir. 1991) ("A residual statute like the [Federal Tort Claims Act], however, cannot co-exist with a comprehensive employment relations scheme .").

Plaintiff's complaint does not provide any detail as to how her other claims arose; however, Plaintiff at paragraph 4 of her Complaint states that those claims not under Title VII "arise out of the same case or controversy."  As such, Plaintiff has conceded that these claims arise from her Title VII claims.

Therefore, Plaintiff's non-Title VII claims should be dismissed for want of jurisdiction.

### B.    *All Common Law Tort Claims Should be Dismissed for Failure to Exhaust Administrative Remedies.*

Even if Plaintiff's tort claims were not otherwise preempted by Title VII, Plaintiff may not pursue such claims because she has not exhausted her remedies under the Federal Tort Claims Act (FTCA). The United States, as a sovereign, "is immune from suit save as it consents to be sued...and the terms of its content to be sued in any court define that court's jurisdiction to entertain the suit." United States v. Testan, 424 U.S. 392, 399 (1976) (citing United States v. Sherwood, 312 U.S. 584, 586 [1941]).  This waiver cannot be implied, but must be unequivocally expressed.  Id.

The FTCA provides a limited waiver of immunity against the United States for certain tort actions.  In this case, the Plaintiff's most glaring problem in asserting tort claims against the government, is that she has failed to submit an administrative tort claim as required under the FTCA.  See 28 U.S.C. 2675.  See also,  *Defendant's Exs. G and H.*

Therefore, Plaintiff's common law tort claims must be dismissed for want of subject matter jurisdiction.[1]

### C.    *Judgment Should be Rendered for the Defendant Because Plaintiff Failed to Take Reasonable  Advantage of Opportunities to Address Her Problems*

Summary judgment is appropriate when, viewing the evidence in the light most favorable to the nonmoving party, the record reflects that no genuine issue of material

---

[1]It should be further noted that the tort claims may also be dismissed for naming an improper defendant.  As set forth in the FTCA, the United States is the only proper Defendant in suits alleging tortious conduct by government employees acting within the course and scope of their employment. Castleberry v. Alcohol, Tobacco & Firearms Div., 530 F.2d 672, 673 n. 3 (5th Cir. 1976).

fact exists, and the moving party is entitled to judgment as a matter of law.  See Celotex Corp. v. Catrett, 477 U.S. 317, 322-24, 106 S. Ct. 2548, 2552-53 (1986); see also Fed. R. Civ. P.56(c).

In the Plaintiff's case, Plaintiff has alleged vague and sweeping allegations that she was the victim of sexual discrimination.  Plaintiff specifically claimed in her Formal Complaint (*Defendant's Ex. F* ) that she was the victim of retaliation.

Plaintiff's complaint fails to support a Title VII retaliation cause of action.  The prima facie claim of retaliation has three elements:  (1) the employee must have engaged in an activity protected by Title VII; (2) the employer must have subjected the employee to an adverse employment action; and (3) a causal nexus must exist between the plaintiff's participation in the protected activity and the adverse employment action. See Mattern v. Eastman Kodak Co., 104 F.3d 702, 705 (5th Cir. 1997).

To carry her ultimate Title VII burden, an employee must also show that her employer would not have taken the adverse employment action "but for" the employee's participation in the protected activity.  See Long v. Eastfield College, 88 F.3d 300, 305 n.4 (5th Cir. 1996).  Plaintiff can produce no such evidence.  Plaintiff was not fired from either her position as a Border Patrol Agent or as a Border Patrol Assistant.   Prior to leaving her position as a Border Patrol Agent, Plaintiff was given an opportunity to raise and discuss her concerns–instead, she told her supervisor, "I didn't want to deal with dope." *Defendant's Ex. B.*

Plaintiff offers no admissible evidence of a causal link between the alleged adverse actions and her filing of a Title VII complaint.  See Grimes v. Texas Dep't of Mental Health and Mental Retardation, 102 F.3d 137, 139 (5th Cir. 1996) (conclusory allegations, unsubstantiated assertions, and subjective beliefs insufficient to support discrimination claim).  Accordingly, judgement should be rendered for the Defendant as to Plaintiff's claims of retaliation.

Plaintiff's claims also ring of allegations of hostile work environment due to sexual harassment.  There are two categories of sexual harassment cases--the first is *quid pro quo* harassment and the other is hostile environment harassment.  It is the latter form of harassment appearing to being alleged by the Plaintiff in the instant case.

Hostile environment harassment is that in which the workplace is "permeated with 'discriminatory intimidation, ridicule, and insult,' that is 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" Harris v. Forklift Sys., Inc., 510 U.S. 17, 21, 114 S.Ct. 367, 370 (1993).

In Harris, the Supreme Court held that Title VII required that "the [work] environment reasonably be perceived, and is perceived, as hostile and abusive." Harris, 114 S.Ct. 367, 370 (1993). This approach--that there are both objective and subjective components--to the analysis of whether conduct is "severe or persuasive" enough to constitute a hostile work environment, was reinforced by the Supreme Court in Faragher vs. City of Boca Raton, 118 S.Ct. 2275, 2283 (1998). In Faragher, the Supreme Court reiterated its stance that Title VII is not a "general civility code" and that "...conduct must be extreme to amount to a change in the terms and conditions of employment." Id. at 2284. See also, Indest vs. Freeman Decorating, Inc. 164 F.3d 258, 263 (5th Cir. 1999).

In Burlington Indus. v. Ellerth, 524 U.S. 742, 118 S. Ct. 2257 (1998), and Faragher v. City of Boca Raton, 524 U.S. 775, 118 S. Ct. 2275 (1998), the Supreme Court discussed the standard for imposing vicarious liability when an employer's supervisors are accused of creating a sexually hostile work environment.

According to the Supreme Court's test, Defendant – even if the allegations of a hostile environment are true--may still escape liability for the conduct of his subordinates if (1) the Defendant "exercised reasonable care to prevent and correct promptly any sexually harassing behavior," and (2) Plaintiff "unreasonably failed to take advantage of any preventive or corrective opportunities provided by [the Defendant] or to avoid harm otherwise." See Ellerth, 524 U.S. at ---, 118 S. Ct. at 2270.

When advised of Plaintiff's complaint, the Defendant's employees swiftly began investigating Plaintiff's complaints by starting a Management Inquiry. *See Defendant's Ex. A-2 and A-3.* All employees referenced by the Plaintiff were interviewed and some changes were recommended to make sure more experienced agents were assigned to the new employees on the night and midnight shifts. *Id.* Plaintiff was offered her Border Patrol Agent job back; Plaintiff declined it. *See Defendant's Ex. A-1 and C.*

6

Plaintiff also failed reasonably to avail herself of Defendant's preventive and corrective sexual harassment policies. During her short tenure as a Border Patrol Agent, Plaintiff never made a verbal or written complaint. In fact, when presented with the opportunity to apprize the Defendant of her problems (shortly before resigning as a Border Patrol Agent), Plaintiff chose to lie.  *See Defendant's Ex. A-1.*

By failing to inform the Defendant of the problems she was having—even when given an express opportunity to do so—Plaintiff acted unreasonably.[2] In her correspondence with Congressman Ortiz, Plaintiff asserts that she lied about the problems she was having because she felt intimidated.  *See Defendant's Ex. A-1.* However, there is no indication that Plaintiff ever had any problems or concerns with APAIC Luna.

However, when an employer initiates a good-faith investigation of charges of discrimination, it must be able to rely on the evidence it collects. By misleading Defendant's supervisors, Plaintiff thwarted the purposes of Title VII and frustrated Defendant's efforts to remedy past misconduct and prevent future harassment by employees.

Therefore, Plaintiff's discrimination claims and claims of hostile work environment should be dismissed.

\

\

\

\

\

\

---

[2]See, e.g., Ellerth, 524 U.S. at ---, 118 S. Ct. at 2270 ("[W]hile proof that an employee failed to fulfill the corresponding obligation of reasonable care to avoid harm is not limited to showing any unreasonable failure to use any complaint procedure provided by the employer, a demonstration of such failure will normally suffice to satisfy the employer's burden under the second element of the defense."); Faragher, 524 U.S. at ---, 118 S. Ct. at 2293 (same).

3.    *Conclusion*

The Plaintiff's claims should be dismissed pursuant to Rule 12(b)(1) and (6) of the Federal Rules of Civil Procedure.   To the extent that this Court must look to matters outside the scope of the pleadings herein, this Court should grant the Defendant's motion for summary judgement pursuant to Rule 56 of the Federal Rules of Civil Procedure.

Respectfully Submitted,

MICHAEL T. SHELBY
UNITED STATES ATTORNEY

Nancy L. Masso
Assistant U. S. Attorney
600 East Harrison Street, No. 201
Brownsville, Texas 78520
Tel:  (956) 548-2554
Fax: (956) 548-2549
Texas State Bar No.  00800490
Federal I.D. No. 10263

**Certificate of Service**

I certify that on **November 26, 2002**, a copy of the Defendant's Motion to Dismiss and Alternative Motion for Summary Judgement With Supporting Memorandum (including exhibits) was mailed to Plaintiff's attorney, Adolfo E. Cordova, Attorney at Law, 711 N. Sam Houston St., San Benito, TX 78586, via certified mail, return receipt requested.

Nancy L. Mass
Assistant U. S. Attorney

**U.S. Department of Justice**
Immigration and Naturalization Service

RECEIVED
FEB 0 9 2001
U.S. BORDER PATROL
MCALLEN, TEXAS

MCA/HRL 100/18.3

01-006

COPY
801

*3902 South Expressway 77*
*Harlingen, Texas 78552*

*February 8, 2001*

MEMORANDUM FOR: JOSE E. GARZA
                CHIEF PATROL AGENT


FROM: Rosa M. Flores
      Border Patrol Assistant


SUBJECT:  Request for Reinstatement as an Agent

    On November 29, 2000, I successfully graduated from the Border Patrol Academy in Charleston, South Carolina.  I was very excited and eager to begin my new career with the United States Border Patrol.

    On December 4, 2000, I E.O.D. in the Weslaco Station.  Upon reporting for my first day of work I was taken to the McAllen Sector to retrieve my equipment and supplies.  On December 5, 2000, I reported to my station for my second day of work on the midnight shift.  It was at this time that I began to experience and began to be exposed to some very demeaning comments made by my fellow co-workers.  Upon driving away from my station and to my designated work area with my journeyman I was questioned about an incident that had taken place at the Academy.  I was told things such as if I was the female agent that filed against the instructor, I was going to be told how things were at the Mercedes station.   As days went by, this was repeated to me by at least the first five different journeymen I was paired up with.  Comments such as, "I am not riding with an EEOC liability and I am not riding with that girl so you better change that schedule" were made to my supervisor (Mr. Don Loucke) and or just made aloud in my presence.  These comments were made by, Paul and other agents that I didn't even want to turn to see who they were.

    I didn't report any of my co-workers behaviors to my PAIC or APAIC because I feared of what the consequences would be if I was already having to tolerate their behavior for something I hadn't done.  I was coming to work in a world of fear and just couldn't bear it anymore so I took the easy way out and resigned.  I am currently working in the Harlingen station and have had the opportunity

**GOVERNMENT**
**EXHIBIT**
    A-1

Page 1 of Govt's Exh A-1

Case 1:02-cv-00048 Document 61 Filed in TXSD on 11/26/2002 Page 10 of 36 PAGE 2
MEMORANDUM FOR Robert GARZA
SUBJECT: Request for Reinstatement as an Agent

sit in during muster. I have seen another female trainee there and have noticed that she is not exposed to the environment that I was. I have noticed that she has what I always expected and that is a fair chance. A fair chance to put my training into use to the best of my ability and knowledge is all that I was expecting to encounter at my perspective station. I realize that I paid a very high price (by turning in my badge) for something I didn't do, but the hostile environment I was exposed to, is something I was not prepared to encounter, nor was it something I should have had to carry on my shoulders.

Mr. Garza I am asking you to reinstate me as an agent and to be given the chance that all trainees are given, but at my current station.

---

Office of the Patrol Agent In Charge
Harlingen, Texas

Forwarded for your information

---

John C. Brinning

**U.S. Department of Justice**
Immigration and Naturalization Service

MCA/HRL 100/5.5.2

3902 South Expressway 77
Harlingen, Texas 78552

February 6, 2001

MEMORANDUM FOR JOSE E. GARZA
                    CHIEF PATROL AGENT
                    MCALLEN SECTOR BORDER PATROL

FROM:       John C. Brinning
            Patrol Agent in Charge
            Harlingen Border Patrol Station

SUBJECT:    Allegation by HRL Employee

    On February 5, 2001 Harlingen Border Patrol employee Rosie Flores requested to speak with me. Flores had recently accepted a position at the Harlingen of Border Patrol Assistant. Previously Flores had spent a short time at the Mercedes Border Patrol station as a recent Border Patrol Trainee, who had returned from the academy.

    Flores informed me that she had an appointment with Chief Patrol Agent Jose E. Garza on February 7, 2001. Flores stated she wanted to explain to Chief Garza why she resigned and to explore the possibility of being reinstated as a Border Patrol Agent. Flores voiced her concern to me that she now had regrets of having resigned from the Border Patrol to accept the Border Patrol Assistant position. Flores went on to state, that she felt resigning was her only course of action due to the predicament she was in.

    Flores stated while in the Border Patrol Academy, an investigation was conducted as a result of sexual jokes being told by a detail Border Patrol Instructor. Flores stated that a fellow female classmate had actually pursued the complaint and that she, Flores, had merely given a statement. Results of the investigation at the academy did not substantiate the allegations made by Flores's classmate. According to Flores, a threat was made against her by the instructor, that he knew people in the Rio Grande Valley & that he could make trouble for her.

Page 1 of 2

GOVERNMENT
EXHIBIT
A-2

Page 1 of Govt's Exh A-2

Flores stated that upon entering on duty in Mercedes, she was singled out by the journeyman agents on her shift. Flores states that repeatedly agents would verbally warn her that they had heard about her and for her not to try filling any allegations against a Mercedes agents. Flores stated she then felt pressured to resign and seek other employment due to the hostile work environment.

I asked Flores if at any time had she contacted management personnel of the Mercedes Border Patrol station in regards to her situation, and she stated she did not.

Agent Gene Pedraza with the Office of the Inspector General in McAllen was contacted on this date and memo faxed.

Agent Ray Fenwick of the Office of Internal Audit in Washington D.C. was contacted on this date and memo faxed.



U.S. Department of Justice
Immigration and Naturalization Service

---

*623 International Blvd.*
*Weslaco, Texas 78596*

February 7, 2001

MEMORANDUM FOR  JOSE E. GARZA
                CHIEF PATROL AGENT

FROM:       San Juanita Luna, APAIC
            Weslaco Border Patrol Station

SUBJECT:    <u>Conversations with Ms. Rosa Flores (previously BPA Flores)</u>

    Approximately three or four weeks after BPA Rosa Flores had EOD'd from the Academy to Weslaco Station, I learned through PAIC John Lopez that she wished to resign immediately. PAIC John Lopez spoke to her and to her Post Academy Instructor Mike Egerton on the reason for her decision. After speaking to both of them at length and ensuring that this was what she wanted, PAIC Lopez advised that BPA Egerton take her down to see OIC Robert Vargas at POE PGR for any possible positions within INS as a possible solution.

    That afternoon I spoke to BPA Flores to discuss her decision and the reason behind it. We spoke alone and she confided that it was a result of an incident where she and her partner had been assigned to lay in on the ground for possible drug smugglers. She had realized that she was not able to do the job, which might result in injury or death to her or to her partner. She had been very good friends with Susan Rodriguez and Susan's death weighed very heavily on her. She said she also realized that being at the Academy was not anything like being out in the field.

    I advised her that she should not resign but allow us to help her find another position within INS. I made calls to both Mary Elgueseba and Rosa Madrigal to seek their assistance with this matter. They were able to find a position that she qualified for and assisted with getting this information to Agent Flores. I advised that Agent Flores was very conscientious in clerical duties.

    In waiting for results from the possible position of Border Patrol Assistant, I had another conversation with BPA Flores. She relayed to me that she was very impressed with the way the agents were trying to get her to continue with her endeavor as an agent. I asked her who some of these agents were and she advised that BPAs Sam Munoz, Rodolfo Vasquez and SPA Paul Reece had all

GOVERNMENT
EXHIBIT
A-3

Memorandum to Chief Patrol Agent Jose E. Garza                    Page 2 of 2
Case 1:02-cv-00146   Document 13   Filed in TXSD on 11/26/2002   Page 14 of 36
Subject: Conversations with Rosa Flores

encouraged her to stick it out. She was very moved by their encouragements and almost started crying from such support from fellow officers. I told her I was pleasantly surprised as these were three of our more "macho" type agents. She stated that she had not seen this type of positive support while at her previous employment at the airport where employees did not help each other or offer encouragement. I told her that I was very pleased that this was the type of conduct afforded to her by our agents. She also informed me that she had had lengthy discussions with her husband and he supported her decision 100% to leave the Border Patrol if this was what she wanted.

She also advised me that she had been under tremendous stress for several weeks after the incident and that her marriage was being affected as she had become withdrawn and quiet. She had finally told her husband of her fears about the dangers of the job and he supported whatever decision she chose. This had lifted a heavy burden off her shoulders.

On her last day of employment with us at Weslaco Station, I had a closed-door conversation with her. It was at this meeting that I again asked her to advise me if there had been any untoward actions, remarks or problems that she had not relayed to me that might be influencing her decision to leave the Border Patrol. I told her that I needed to know regardless if she chose to leave the Border Patrol or not and I needed to address such behavior on any one's part. She advised me again that she had received only exemplary treatment from the majority of the agents. She had only experienced two incidents that she felt were not worth worrying about. I asked her to tell me what they were. During a muster she had approached SPA Cristela Vasquez to introduce herself and shake her hand. Agent Vasquez looked at her and did not offer her hand immediately. Instead Agent Vasquez just gave her a quizzical look and then halfheartedly shook her hand. The other incident was that on Thursday prior to her last day SPA Paul Reece made a comment (indirectly but where she could hear) to the effect "isn't it shame that the Service spends thousands of dollars to get someone through the academy and someone just quits?". During this incident, SBPA J.D. Solis overheard the comment and immediately addressed him to keep his personal opinions to himself.

BPA Flores reiterated that these two incidents did not affect her decision in any way as she considered it petty and insignificant behavior of a personal nature or "it's their problem". I attempted to stress to her the importance of being open with me on any issues that might affect her decision to leave the Service and/or that I should be made aware of. Again she advised that her decision was based on her fear of being placed in such a predicament again where she might not be able to function and place herself or her partner in a life or death situation.

Her only concern at this time was that she might be bored in this new position and was afraid that it would be a dead-end job with no potential for advancement. I encouraged her to look at it as a way to make her mark and establish her reputation as a dedicated and conscientious employee so that when openings for Examination or Deportations came open she would have the support of her supervisors.

Our conversation ended in a positive note with her advising that she had truly enjoyed her time at this station



**U.S. Department of Justice**
Immigration and Naturalization Service

---

*623 International Blvd.*
*Weslaco, Texas 78596*

February 16, 2001

MEMORANDUM FOR JOSE E. GARZA
                CHIEF PATROL AGENT

FROM:        San Juanita Luna, APAIC
             Weslaco Border Patrol Station

SUBJECT:     Discussion with SBPA Donald C. Louck (Re: Rosa Flores)

    On Wednesday, February 14, 2001 I conducted an interview with SBPA Donald C. Louck at the Weslaco Border Patrol Station. FOS Raul Vela was a witness to this interview. I explained to SBPA Louck that some allegations had been made on actions or failure to act regarding Ms. Rosa Flores while she was employed at the Weslaco Station as a Border Patrol Agent trainee.

    In particular I asked him if he had ever changed assignments when agents were assigned to work with Ms. Flores as their trainee. He replied that he never changed the assignments for that reason. SBPA Louck advised that SPA Paul Reece was usually vocal about being assigned to work with any other agent, as he preferred to work alone. He especially did not like to be assigned to trainees. SBPA Louck stated that he only made changes to assignments, which are done the previous day when someone calls in sick or needs EAL and he, therefore, needs to make changes. In those situations, he like the other supervisors, will assign senior journeymen solo if they are odd-man out.

    SPBA Louck never heard Agent Reece make explicit comments about working or not working with Ms. Flores. Agent Reece had tried "sweet talking" him into changing the schedules but he had refused but again it was just generally wanting to work alone as most SPAs do.

    SBPA Louck did not have any recollection about BPA Hector Zamora making any comments or requesting changes in agent assignments.

    When SBPA Louck was asked if anyone had ever made comments during muster, which would seem denigrating or demeaning. Agent Louck said emphatically not. He advised most of the agents knew that there had been a problem with her and some EEO matter at the Academy and did not say anything about it, at least in his presence.

    SBPA Louck did not have anything else to add to this discussion.



**U.S. Department of Justice**
Immigration and Naturalization Service

---

*623 International Blvd.*
*Weslaco, Texas 78596*

February 16, 2001

MEMORANDUM FOR  JOSE E. GARZA
                CHIEF PATROL AGENT

FROM:        San Juanita Luna, APAIC
             Weslaco Border Patrol Station

SUBJECT:     <u>Management Inquiry; Re:  Rosa Flores</u>

      In reviewing the available G-481s (dailies) and the station assignment sheets (enclosed with this package) I personally did not see where changes were made to either forms as mentioned by Ms. Rosa Flores.  Any changes that were seen to have been made dealt with agents in general such as when agents called in sick or needed EAL.  Circumstances such as those would necessitate the supervisor or ASBPA making changes as needed for operational purposes.

      Those operational changes would be made to assign a senior journeyman solo and keep two junior officers together for safety reasons especially on the night or midnight shifts.

      It should also be noted that three supervisors were assigned and available to Ms. Flores' shift at any given time.  Ms. Flores also did not confide in either her Law or Spanish instructors of any potential or disturbing problems.  Also, I had numerous personal conversations of both friendly and developmental nature in ensuring that Ms. Flores was doing well in her environment.  At no time did she confide in me of any problems with her job, duties, responsibilities or other personnel.  Because she relayed in strong and positive terms that her tenure at the Weslaco Station was a positive and learning experience I do not, therefore, feel that there is a basis for allegations of misconduct by agents or supervisors at this station.

      Because there has not been any EEO training conducted recently at Weslaco Station and because agents might have brought up the matter of the EEO inquiry with Ms. Flores in the normal course of conversation, we are presently working on a training module to incorporate rights, principles, guidelines, as well as appropriate behavior toward all employees.  This training will commence on March 6, 2001.



**U.S. Department of Justice**
Immigration and Naturalization Service

_623 International Blvd._
_Weslaco, Texas 78596_

February 16, 2001

MEMORANDUM FOR JOSE E. GARZA
                CHIEF PATROL AGENT

FROM:        San Juanita Luna, APAIC
             Weslaco Border Patrol Station

SUBJECT:     Discussion with Ms. Rosa Flores (previously BPA Flores)

    On Wednesday, February 14, 2001 I conducted an interview with Ms. Rosa Flores concerning her memo dated February 8, 2001. Her memo alleges behavior by agents while she was stationed at Weslaco Station as a trainee. Ms. Flores was accompanied by Border Patrol Agent C. Maxwell (Brownsville Station). I requested that FOS Norma Cortez be in attendance at this meeting. This request was made in the hopes that Ms. Flores might be more comfortable in her presence as she had not dealt with FOS Castro prior to this. While waiting for Agent Maxwell, FOS Cortez and I attempted to alleviate Ms. Flores' fears that she was under some internal investigation.

    Prior to our discussion, Agent Maxwell met privately with Ms. Flores for a lengthy time.

    During this discussion I explained to Ms. Flores that this meeting was a Management Inquiry into possible inappropriate or misconduct on the part of agents and supervisors at the Weslaco Station. I again explained to her as I had done earlier that if I had failed to recognize a problem or if management had knowingly failed to address a problem, we would seek to address and correct such needs. I asked Ms. Flores to explain how agents had exposed her to demeaning comments.

    Ms. Flores relayed that while working the midnight shift several agents had personally attacked her verbally. While working with Agent Paul Reece he had made comments of "if you were the female who filed an EEO we don't like people like that here and let me tell you how it's here", etc. He relayed that previous possible EEO complaints had been dealt with but she did not elaborate more than that. She told him she had not been the one to file any EEO complaint.

    When Ms. Flores worked with Agent Dorothy Hunter, she was told that she had also run into similar problems and told her "you'd better get ready to face such problems and to suck it up."

Memorandum to Chief Patrol Agent Jose E. Garza                    Page 2 of 3
Subject: Discussion with Ms. Rosa Flores

Ms. Flores worked with SPA Robert I. Gonzalez who immediately told her "let's get something straight, there's a lot of talk that you filed against an instructor at the Academy. Nobody likes a female who files."

Ms. Flores relayed that other agents that she worked with were very professional and cordial. SPA Anselmo Garcia let her know straight away that he did not want to know about what had happened at the Academy and that his job was to show her the duties and responsibilities of the job. She also mentioned that SPA Rodolfo Vasquez had given her no problems either.

Ms. Flores mentioned that right before termination of her employment at the Weslaco Station, she was working with BPA Edmundo Flores and that he was extremely supportive. On that day they met with the horse patrol (SPA's Paul Reece and Rodolfo Vasquez) who wanted to know why she was leaving. She expressed to them that she was leaving because she would never be forced to go into the jungle trail by herself. Agent Reece asked her who had told her she had to go into the jungle trail by herself. Ms. Flores responded that Agent D. Hunter had told her she would have to go into the jungle trail when they had worked together. Agents Reece and Vasquez had told her they wouldn't make her go in by herself.

Ms. Flores mentioned to us that when she had worked with Agent Hunter, she had immediately gone home and told her husband "those people will get me killed" because agents like D. Hunter wanted her to go into the jungle trail. She felt agents were putting her in unsafe situations.

Ms. Flores relayed the incident when she worked with BPA Rodney Nichols. She was driving that night and they received information on possible narcotics smuggling. It was during this incident that she had flashbacks of Agent Susan Rodriguez' death. These flashbacks along with what she felt was Agent Nichols' condition that night caused her to be afraid for her life. When asked of Agent Nichols' condition she felt that he was hung over from partying the previous night. Also she felt that the weather conditions (foggy and slick road conditions) along with Agent Nichols' condition made it an unsafe work environment for attempting to make a vehicle stop.

I asked Ms. Flores what had transpired during musters and why she could only remember one supervisor when there were three supervisors on her shift. She advised that SBPA Herrera had been out due to a back injury and that she did not remember SPBA Torres being around. She distinctly remembered that during muster SPA Paul Reece was very loud in advising that he did not want to work with "that female" or "that girl". These comments were also overheard by her being made by BPA Hector Zamora. She stated that she heard other agents make similar comments but she did not want to turn around to see who was making them. But that she recognized these two voices. She stated that when these comments were made, SBPA Louck would make changes to the schedule and not address the agents who made the comments.

On her last night at work, she knew she was not going to be assigned to Agent Reece. She saw Agent Reece walk up to the assignment sheet on the muster desk and say "I don't want to work with her." She knew at that time from seeing the assignment sheet that he was just saying it to simply upset her or for other reasons.

She stated that when SBPA Herrera came back from sick leave he made sure to advise any agent expressing that did not want to work with someone that they would keep their assigned partners and no changes would be made.

Ms. Flores opined that most of her problems at Weslaco Station resulted from Agent Miguel Lopez, her instructor at the academy. She advised that Investigator Silva (collateral EEO counselor) had interviewed the three females from her class as well as three male agents about Instructor Lopez' actions in regards to a female trainee (Ms. Vega). Mr. Lopez threatened the whole class with a statement "I have friends who will take care of people who give me problems". It was made as a general statement but she felt it was directed at her for her speaking to the counselor. She felt that both she and Ms. Vega were targeted as "trouble makers" although the other female was not nor were the three male agents. She felt this was because the other trainee was a female of questionable morals who made herself available to the men.

Ms. Flores relayed that Mr. Silva (EEO counselor) had told Ms. Vega (female trainee) that "they would change her duty station once she got there and she experienced problems because of the comments made by Instructor Lopez". Ms. Flores also relayed that she knew that Instructor Lopez had made a call to the Weslaco Station to warn his classmate about her. When I asked for the classmate name or when this call was made, Ms. Flores advised she did not know the name of the classmate or when the call was made. She claimed that Agents Amado Gomez, Chris Lobato and Edmundo Flores all knew who the classmate was. None of them or anyone else had told her that a call was made but she knew that it had been made because Instructor Lopez had a classmate here at Weslaco Station.

Ms. Flores expressed that while sitting in a muster at the Harlingen Station, she was able to see that the agents there treat their female trainee with the utmost professionalism and it was at that time that she saw that her treatment was only something that happened at Weslaco Station. She realized that she could work as an agent in Harlingen because all trainees were not vilified, scorned or abused as she and other trainees had been.

Ms. Flores finished her discussion with a statement that she wished to turn in a memo regarding her problems at the Academy and at Weslaco Station.

Ms. Flores again reiterated that she did not want to work with "those people" ever again. When asked who precisely "those people" were she narrowed it down to the agents on her shift. More so, it was agents like Agent Cristela Vasquez (who was not on her shift) who had been one of the worst of all the agents. She had treated her the worst by not shaking her hand or welcoming her into the fold. She did not trust any of them with her life and felt "they would not cover me or back me up."

At the end of our discussion, Agent Maxwell asked if the offer of reinstatement was still open. I advised that since I was not privy to the discussion between Ms. Flores and Chief Garza, I could not answer.

**U.S. Department of Justice**
Immigration and Naturalization Service

RECE
MAR 1 3 2001
U.S. BORDER PATROL
MCALLEN, TEXAS

*623 International Blvd.*
*Weslaco, Texas 78596*

March 9, 2001

MEMORANDUM FOR JOSE E. GARZA
　　　　　　　　CHIEF PATROL AGENT

FROM:　　San Juanita Luna, APAIC
　　　　　Weslaco Border Patrol Station

SUBJECT:　　Discussions with Weslaco Agents Re: Ms. Rosa Flores (previously BPA Flores)

On March 6th, 2001, I requested to speak with SPA Reece and advised him that he could have union representation as it was regarding a management inquiry. SPA Reece declined any witnesses or representation during our discussion.

I inquired of Agent Reece whether he had made any statements at muster or while working together with Ms. Flores that he did not want to work with "females" or "agents that filed EEO complaints", etc. I also asked him if he had heard such statements at musters from other agents.

SPA Paul Reece stated that the only night they were assigned together she had asked him for advice because she "was feeling that agents felt she was the one in her class who had filed an EEO complaint." Agent Reece asked her if anyone had directly accused her and she replied "no." So he told her she should not be assuming that they were thinking that. She went on to explain all the circumstances of the EEO problem at the academy. She wanted everyone to know that she was not the female who had filed.

He commenced his statement by revealing that she had discussed with him the fear of being made to go into the jungle trail. This discussion was made the night they were assigned to work together. In the vehicle he asked her if she still felt that way if a fellow agent needed her help while that agent was in the jungle trail. Her reply had been, "not if I don't know where I am." He explained to her that agents would not expect her to go into such a situation by herself so early into her tenure and more so as a rookie trainee.

He vehemently denied ever making statements about not working together as supervisors had only assigned them together one time so there was no reason for him to argue the point with any

supervisors. He did admit to the comment that he made on her last day about "well, there goes a waste of money on a job that somebody else wanted." He made this statement because he felt that the Service had invested thousands of dollars on someone who chose to quit so early on.

He also claims never to have heard anyone else make disparaging remarks to her or about her. He stated he wanted to help if she was having problems with Agent Hunter or anyone else who might be giving her possible problems. He spoke to SBPA Henry Herrera and requested that he be assigned to her for several days consecutively so that he could ascertain if she had a personality conflict with Agent Hunter or if there were some other problems causing this decision.

SBPA Henry Herrera later corroborated this request. I asked Agent Reece how she done out in the field the night they worked together. He replied that she displayed little initiative and did not follow directions. When working ground traffic, he directed her to wait in one spot and advise him if she saw anything. He would be working a little ways away from her. He then sees a person silhouetted walking the levee coming to him. When he saw it was Ms. Flores he advised her that she had probably blown their positions but he would not document this oversight but that she needed to show more responsibility toward safety and instructions given. Other than that he did not have anything negative or pertinent to say regarding Ms. Flores.

On March 7th, 2001 I requested to speak to BPA Dorothy Hunter. I also advised her that she could have union representation regarding the management inquiry. She declined any representation. Agent Hunter relayed that no remarks were ever directed at Ms. Flores during musters or at any other times. There was only the usual bantering about all trainees in general such as "I got to work with a trainee tonight."

Agent Hunter recalled that while working with Ms. Flores (at least twice) she tried to watch out for her to make sure she was not faced with adverse situations she might not know how to handle. Agent Hunter advised her that if she ever encountered crude behavior that she should talk to her husband (Agent Luis Flores, Harlingen Station) for advice. Agent Hunter was told she never talked to her husband about work. Agent Hunter also expressed to her that if she ever encountered a situation that she could not tolerate either ethically or morally to talk to her so she could help her. Ms. Flores felt she had been around agents long enough (from previous job and associations) that she could handle herself or speak for herself.

As a training exercise, Agent Hunter along with a GS-11 and four trainees went into the jungle trail at night to acclimate the trainees on lay up areas, etc. At no time did she tell her she would send her in alone. To do so would place her in an unsafe situation and would be negligent on her part as the senior officer. Agent Hunter did not feel that Ms. Flores had the initiative needed to learn the job. She did not ask questions on working traffic or areas. She talked mostly about her old job. Agent Hunter had to bring discussions back to related duties.

After Ms. Flores had left the Service, Agent Hunter was told by one of Ms. Flores' previous journeymen "Everyone wants me to be like Dot and I can never be like her" so she had felt she could not do the job. Ms. Hunter could not remember who told her this. Agent Hunter relayed that she commended Ms. Flores to all agents about having the maturity to leave a job she felt she was not suited for.

Memorandum to Chief Patrol Agent Jose E. Garza
Subject: Discussions with W....aco Agents

On March 7, 2001, I requested to speak with SPA Robert I. Gonzalez and advised that he could bring in union representation on this management inquiry. He also declined any representation. Agent Gonzalez relayed to me that SBPA Manuel Torres had requested that he work with Ms. Flores so that she could be informed of SOP, guidelines and duties. At the start of their shift he discussed how she needed to be here on time if not earlier, her uniform pressed, brass shined, etc. In the course of the night much later she brought up the previous EEO matter. She told him "I know everyone is wondering what happened." He agreed to this comment and asked her if she wanted to talk about it. She then went on to tell him everything. He told her that rumors had been flying around but he was glad he knew the whole story.

He did admit that he made her sit separate from the journeymen. He stated that this is his practice with all trainees and that he had explained this to her. She did not have a problem with it. He never heard any comments directed at her directly except for general comments like "trainees" at musters. He never heard negative comments except her fear of the dark and staying close to agents when working sensor traffic in the dark.

Agent Gonzalez has known Ms. Flores for quite some time as he was stationed in Harlingen Station previously and worked the airport as part of his duties. She felt comfortable with him and readily told him things like "Luis (her husband) never told me how things really were" out in the field, or what was expected.

Agent Gonzalez relayed that he had just seen her at the Harlingen Station when he went to training. She had been quite friendly to him and had not expressed any problems to him about conditions, other agents or the job in general except it was not anything like she thought it was going to be.





U.S. Department of Justice
Immigration and Naturalization Service

---

*623 International Blvd.*
*Weslaco, Texas 78596*

April 3, 2001

MEMORANDUM FOR JOSE E. GARZA
                  CHIEF PATROL AGENT

FROM:      San Juanita Luna, APAIC
             Weslaco Border Patrol Station

SUBJECT:   <u>Discussions with Weslaco Agents Re: Ms. Rosa Flores (previously BPA Flores)</u>

On March 23, 2001, I requested to speak with BPA Hector Zamora and advised him that he could have union representation as it was regarding a management inquiry. BPA Zamora inquired if the inquiry was of a nature to warrant disciplinary action at this time. I explained that a statement was needed from him regarding Ms. Flores while she was stationed here. BPA Zamora did not have a problem with giving a statement regarding Ms. Flores without a witness or union representative present.

BPA Zamora stated that he had never been assigned to work with Ms. Flores during her tenure at this station. He also stated that he had never made any comments about not working with her at musters or any other place. He stated that he had not communicated with her on a personal nature or "one to one" as there had been no need having never been assigned to work together.

Knowing that he has a tendency to "cuss or swear" at times, he tended to avoid any unnecessary conversations as he did not want similar problems over EEO violations as he had heard had happened at the Academy with someone from Ms. Flores' class.

BPA Zamora stated that she had never come to him to voice or communicate any problems or seek advice from him.

The consensus of the shift was that everyone was being cautious overall not to say or do something that a trainee or someone in her class would find offensive. He acknowledged that only some of the senior agents joked with each other but not with the trainees. The trainees were treated with kid gloves, i.e., no "heavy joking or inappropriate comments".

Memorandum to Chief Patrol / at Jose E. Garza                                    Page 2 of 2
Subject: Discussions with Weslaco Agents

On March 23, 2001, I requested to speak with both BPA Edmundo Flores and BPA Richard Scanlan prior to their leaving from Enforce Training in Harlingen Station.  I informed them that this was relating to a management inquiry.  I inquired from both of them if they had witnessed any inappropriate behavior or comments by any agents toward Ms. Flores.  BPA Edmundo Flores remembered that Ms. Flores was quite worried about how Susan Rodriguez had died.  She also brought up that she feared going into the jungle trail.  When he learned that she was planning on resigning from the Service, he attempted to find out the reason and sought advice from SPA Paul Reece.  She seemed to be freer in talking to SPA Reece in telling him her problems and fears, which again related to being placed in a "life or death" situation.  BPA Edmundo Flores never heard any agent make any comments directed at her, any female or trainee during musters.

BPA Scanlon voiced similar observations.  He stated that he never observed or heard any agent make a comment at musters that they did not want to be assigned to work with Ms. Flores.  The only joking that was made was senior agents (as compared to trainees) making jokes with other senior agents.  He never heard any comments that he would have found offensive or hurtful by other agents toward the trainees or Ms. Flores in particular.  He felt that the shift enjoys a harmony shared by all agents and there have been no problems among the shift members in regards to agents having problems with other agents.  BPA Scanlan is one of the union representatives and consistently attempts to stay in tune with any possible conflicts at this station.  He attempts to resolve these problems at the lowest level if possible by having agents work out any potential problems.  He has also made it a point to come to me when he feels that I might be of assistance in resolving such problems.  He was surprised to hear that she had voiced any problems or actions directed at her specifically while stationed at the Weslaco Station.

On today's date (April 3, 2001), FOS Jose D. Solis and I spoke to SBPA Robert I. Gonzalez.  I inquired if the practice of having trainees sit alone was an action practiced by only him.  He replied that it was an action that was practiced by most if not all of the agents on his shift.  He also stated that the day after he had worked with Ms. Flores, several trainees on duty were instructed to sit separate from the journeymen.  He claimed that journeymen practiced this while he was stationed in Brackettville, Texas and this was also practiced in Harlingen, Texas.

He understood that such a practice could be construed as hazing at the least and possibly harassment at the worst.  Even though some trainees might understand that it was not meant to be demeaning or harassing, another trainee might.  He advised that as supervisor he would ensure that this was no longer practiced on any shift that he was supervising.

At the 2 P.M. muster on this date, all agents were advised that the action of sitting trainees separate from other journeymen would cease.  All agents must be afforded parity, professionalism and a comfortable work environment free of hazing or harassment.  All other musters will be addressed in a similar fashion.

Rosa Maria Flores
1730 Peach Tree Court
Harlingen, Texas 78550


HONORABLE PHIL GRAMM
U. S. Senator
222 East Van Buren #404
Harlingen, Texas 78550


February 26, 2001

Re:  Assistance in Job Reinstatement

HONORABLE PHIL GRAMM:

It is with great respect and hope that I am writing to you.  I am a 31-year-old female who
successfully graduated from the United States Border Patrol Academy in Charleston,
South Carolina on November 29, 2000.  At this point in my life I was very excited and
eager to begin my new career with the Service at the Weslaco, Texas station.  I expected
to encounter the opportunity to put my training and knowledge to use as well as, my
continuation to learn from the agents at the station (my journeymen).

It was to my surprise that I encountered a hostile working environment at the station due
to the fact that everyone in my shift was put under the impression that I had filed a
complaint against my Spanish instructor at the Academy.  Comments such as "I'm not
working with that girl", "I don't want to work with that female", and "I am not riding
with that E. E. O. C. liability for eight (8) or ten (10) hours were made in my presence to
my supervisor Mr. Don Loucke.  When we would leave the café and headed to our
designated work areas I was told by some of my journeymen that "If I was the girl or
female that filed against the instructor I was going to hear how it was at this station.
They also said these remarks while they put their finger up to my face.  One of my
journeymen was a female named Dorthy Hunter.  She to was one who questioned me in
our unit.  She went on to tell me "to get ready to face it".  She said she had a similar
situation when she had arrived at the Weslaco station and suggested that "I suck it up"
until the end of my first year.  I tried to do what Ms. Hunter suggested but I couldn't
carry the weight anymore.

**GOVERNMENT EXHIBIT**

**B**

Page 1 of Govt's Exh B

On February 2, 2001, I resigned as an agent at the McAllen Sector. My Assistant Patrol Agent In Charge did ask me if anyone had said something or did anything to me. I shrugged my shoulders and said, "I didn't want to deal with dope". I for the first time in my life and unlike me I took the easy way out and turned in my badge. Why didn't I say anything is what I was asked by the Chief Patrol Agent Mr. Garza at the McAllen sector when I had a meeting with him on February 7, 2001? Why didn't I say anything is what my Assistant Patrol Agent In Charge asked me on February 14, 2001, when I was served with a Notice to Appear for a Management Inquiry? Well Mr. Gramm, allow me to answer this question to you just like I answered them. I feared of what the consequences would be if I already had to tolerate their behavior for something I hadn't done. I didn't have much trust on the management staff for the simple reason that a supervisor had witnessed their behavior during Muster.

On February 5, 2001, I began to work as a Border Patrol Assistant in the Harlingen, Texas, station. I have had the opportunity to sit in muster at the beginning of my shift. I have seen another female trainee there and have noticed that she is not exposed to the environment that I was. I have noticed that she has what I always expected and that is a fair chance. A fair chance to put my training into use to the best of my ability and knowledge is all that I was expecting to encounter at my perspective station. Mr. Gramm I realize I paid a very high price for something I was not prepared to encounter, nor was it something I should have had to carry on my shoulders.

On February 12, 2001, Ms. Madrigal from the personnel department called me and told me that the Chief Patrol Agent had approved my reinstatement as an agent, but I would have to return to the station in Weslaco. I turned down the offer because I cannot trust those agents with my life. In this field the opportunities for me to trust my co-workers with my life are very high and I know that this will prevent me from doing my duties. I have asked Mr. Garza to reinstate me at my current station, which would be Harlingen, Texas.

On February 21, 2001, I called the investigator Mr. Armando Silva, at the Academy in Charleston, South Carolina and asked him "What kind of protection did he have for his witnesses". To my surprise he said that he didn't. He said "Mrs. Flores you have to understand I can't use my authority over the Chief because I would be risking my chances as far as getting a position in the McAllen Sector".

I have contacted the E. E. O. C. and have been told that they cannot help me. Mr. Gramm I don't know who else to turn to. It is sad to say that all of this transpired over an investigation that took place at the Academy. I have been told that the instructor called his classmate that works at the Weslaco station and told him that it was I who filed a complaint against him. Mr. Gramm the lady at the E. E. O. C. said it best when she told me "I was black balled". Sir, will you please help me in whatever way that you can?

Respectfully Submitted,

Rosa Maria Flores

Cc: Memo to Mr. Garza
    Notice to Appear



**U.S. Department of Justice**
Immigration and Naturalization Service

30/2.1

---

*2301 S. Main*
*McAllen, Texas 78503*

January 8, 2002

MEMORANDUM FOR:  REGIONAL DIRECTOR (CROBOR)
                 CENTRAL REGION

FROM:        Jose E. Garza
             Chief Patrol Agent

SUBJECT:     Congressional Inquiry Re: Ms. Rosa M. Flores

In response to a congressional inquiry from Congressman Solomon P. Ortiz's office concerning Ms. Rosa M. Flores, that subject was researched and addressed to Senator Phil Gramm by headquarters congressional relations in May of 2001. We believe the information set out in that response was and still is accurate.

Ms. Flores resigned from her position as a Border Patrol Agent Trainee shortly upon returning to the Sector from the Academy. Ms. Flores immediately applied for and was selected as a Border Patrol Assistant at the Harlingen Border Patrol Station, Harlingen, Texas.

In February 2001, Ms. Flores approached the Chief about being reinstated as a Border Patrol Agent trainee. The Chief agreed to reinstate her. Ms. Flores did not want to be reinstated at her original duty station, but instead wanted to be reinstated at the Harlingen station, where her husband is also a border patrol agent.

Ms. Flores' original appointment was to the Weslaco Station where the need for additional manpower existed, and still existed when Ms. Flores asked for reinstatement.

Direct questions to Assistant Chief Patrol Agent Harry L. Beall at (956) 984-3817.

Attachments
hlb/
cc: HQBOR

GOVERNMENT
EXHIBIT

C



**U.S. Department of Justice**
Immigration and Naturalization Service

INS Administrative Center, Dallas
7701 N. Stemmons Frwy, ACDEEO
Dallas, TX 75247

## Request to Mediate

The aggrieved person/complainant, hereby requests to participate in mediation to facilitate resolution of EEO complaints based on Sex (female)  wherein he/she alleges:

While stationed at Weslaco Border Patrol Station, TX, I was exposed to a hostile work environment by several of the agents, comments were made to the effect of, "I am not riding with that girl, I am not riding with an eeo liability for 8 to 10 hours, I am not riding with that female". These comments were made to my supervisor out loud and made in my presence. While riding in my vehicle with my journeyman he  put his finger in my face and ask me if I was the girl that filed and eeo complaint against my instructor at the academy, you are going to see how it is here at the station. My entire duration of harassment at Weslaco Border Patrol Station was unnecessary due to misinformation communicated to the Weslaco Border Patrol Station.

Formal complaint(s) at issue include the following (identify each formal complaint number):

**None**

**The aggrieved person/complainant acknowledges that, if applicable, this request will extend the informal counseling period from thirty to ninety days in accordance with Title 29 Code of Federal Regulations Section 1614.105 (f).  Similarly if an individual enters into an ADR procedure after a formal complaint is filed, the time period for processing the complaint may be extended by agreement for not more than 90 days.**

As a condition of mediation, the aggrieved person/complainant agrees that:

1. The mediator is a neutral third party.  The role of the mediator is to help the parties create a mutually satisfactory resolution agreement.

2. The parties in the mediation will not call the mediator as a witness in the event of any judicial or administrative proceeding relative to the above-referenced complaint.



GOVERNMENT
EXHIBIT

D

Page 1 of Govt's Exh D

3.  In order to facilitate resolution attempts, offers and statements made during the mediation session (s) will be confidential, and all notes made during the mediation sessions(s) shall be collected and destroyed by the mediator(s) at the conclusion of each mediation session.

4.  The aggrieved person/complainant may be accompanied by one representative. In the event that the aggrieved person/complainant will have a representative, the ADR Office shall be notified in writing with the name of the representative.  No more than one representative will be present at the mediation.

5.  Bargaining unit employees may also elect to have a union representative present at the mediation.  In the event that the bargaining unit employee elects to have a union representative, the Designated Management Official shall promptly notify the union.

6.  The bargaining unit employee does / does not (circle one) also elect to have a union representative present at the mediation.

7.  In the event there is no resolution (in an informal complaint), the aggrieved person/complainant will be referred back to the Intake counselor for the issuance of the notice of right to file a formal complaint within 15 calendar days.

To:  Mr. J. R. Villareal
      Assistant Patrol Agent  In Charge

From:  Rosie Flores
      Border Patrol Assistant

Date:  August 14, 2001

Re:  Letter of Resignation


Mr. Villareal, I hereby inform you of my resignation as of today.  We both know I have had a very hard time trying to cope with the discrimination and harassment I was exposed to while I was employed at the Weslaco Station.  I'm sure that you can imagine how hard it has been for me to face the agents in uniform knowing that I too should be wearing one. I had never known what it was to call in sick until I did last month.   I have sought counseling and have bounced back on my feet however, I don't think that it is healthy for me to be around people who are wearing the uniform I earned, while I'm just a filing clerk.  I feel that too many of talents are going to waste and will only cause me to slip into depression again.   This is why I am unable to give you two weeks notice.

I thank you for the times you allowed me to ventilate in your office and for the times you listened when I needed someone.  I hope that you always remain open minded and available to the needs and concerns of your staff.

Sincerely,

*Rosie Flores*

Rosie Flores

GOVERNMENT
EXHIBIT

E

Department of Justice

# Complaint of Discrimination

(See instructions on reverse)

Y ACT STATEMENT: 1. AUTHORITY-the authority to collect this information is derived
J.S.C. Section 2000e-16; 29 CFR Sections 1614.106 and 1614.108. PURPOSE AND
form will be used to document the issues and allegations of complaint of discrimination
race, color, sex (including sexual harassment), religion, national origin, age, disability
or mental), sexual orientation or reprisal.

The signed statement will serve as the record necessary to initiate an investigation and will
become part of the complaint file during the investigation; hearing, if any; adjudication ; and
appeal, if one, to the equal employment Opportunity Commission. 3. EFFECTS OF NON-
DISCLOSURE-Submission of this information is MANDATORY. Failure to furnish this
information will result in the complaint being returned without action.

laimant's Full Name

A M. FLORES

ddress, RD Number, or Post Office Box Number

) PEACH TREE COURT

ic and Zip Code

.INGEN, TEXAS 78550

2. Your Telephone Number (including area code)

Home: **(956) 421-4551**

Work: **(956) 366-3000**

t Department of Justice Office Do You Believe Discriminated Against You?

BORDER PATROL

4. Current Work Address

**3902 S. EXWAY. 77, HARLINGEN, TEXAS**

A. Name Of Agency Where You Work

**U.S. BORDER PATROL – HARLINGEN OFFICE**

B. Street address of your agency

**SAME AS ABOVE**

Address of Office

**INTERNATIONAL BLVD.**

State and Zip Code

ACO, TEXAS 78596

C. City, State and Zip Code

**3902 S. EXWAY. 77, HARLINGEN, TEXAS**

D. Title and Grade of Your Job

**BORDER PATROL ASST. GS-05**

| n Which Most Recent Alleged nation Took Place | | |
|---|---|---|
| nth | Day | Year |
| | 19 | 01 |

6. Check Below Why You Believe You Were Discriminated Against?

[] Race or Color (Give Race or Color) _____

[] Religion (Give Religion) _____

[X] Sex (Give Sex)    [] Male    [X] Female

[] Sexual Harassment

[] Age (Give Age) _____

[] National Origin (Give National Origin) _____

[] Disability    [] Physical    [] Mental

[] Sexual Orientation

[X] Reprisal

n How You Believe You Were Discriminated Against (Treated differently from other employees or applicants) Because of Your Race, Color, Sex (including arassment), Religion, Nation Origin, Age, Disability (physical or mental), Sexual Orientation, or Reprisal (You may continue your answer on another sheet of paper ed more space).

See attached page for response.

Corrective Action Do You Want Taken On Your Complaint?

See attached page for response.

| ave Discussed My Complaint With An Equal Opportunity Counselor | 11) Name of Counselor | [] I have not contacted an EEO Counselor |
|---|---|---|
| f FIRST CONTACT:    DATE OF FINAL INTERVIEW: | | |
| 16    01 | REYNOLD Q. RUIZ | |

| of This Complaint: | | 14. Sign Your Name Here: |
|---|---|---|
| Day | Year | _Flores_ |
| 13 | 01 | |

FORM DOJ-201A
SEPT 96

GOVERNMENT
EXHIBIT
F

Page 1 of Govt's Exh F

**Response to number 7.**

Co-workers would verbally in my presence tell the supervisor they didn't want to work with that girl, that female, didn't want to ride with and EEO liability for 8 - 10 hours. Co-worker refused to get in the vehicle with me because I was a female. It was very clear that I was being singled out as a female. They also discriminated against me because they thought I had made an EECC complaint at the academy thus making me a whistle blower.

**Response to number 8.**

Reinstatement, back pay, seniority, front pay and attorney fees.

State of Texas

County of Dallas

### AFFIDAVIT OF LINDA O. LAST

My name is Linda O. Last.  I am employed by the Immigration and Naturalization Service and I currently work in the Central Regional Counsel's Office in Dallas, Texas.  Part of my job duties include receiving, tracking, and processing administrative claims pursuant to the Federal Tort Claims Act. As part of those duties, I maintain, update and reference the database on all administrative claims received.

I have reviewed the database maintained in this office and find that no claim was ever received from Rosa M. Flores, Rosa Flores, or Rosie Flores.

Pursuant to 28 U.S.C. 1746 I hereby declare under penalty of perjury that the foregoing statement is true and correct. Signed on this the ___14th___ day of November, 2002.

Linda O. Last
Regional Counsel's Office
Immigration and

Naturalization

Service
Dallas, Texas

**GOVERNMENT
EXHIBIT
G**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION


| | |
|---|---|
| ROSA M. FLORES, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Case No. B-02-146 |
| | ) |
| | ) |
| JAMES W. ZIGLER, | ) |
| COMMISSIONER FOR THE IMMIGRATION | ) |
| AND NATURALIZATION SERVICE (INS) | ) |
| | ) |
| Defendant . | ) |
| _____ | ) |


<u>DECLARATION OF ALETA BODOLAY</u>

In accordance with the provisions of 28 U.S.C. § 1746, I, Aleta Bodolay, hereby make the following unsworn declaration, under penalty of perjury, in respect of the above-styled case.

1. I am employed as a Claims Examiner within the United States Department of Justice, Washington, D.C. As such, one of my responsibilities is the reviewing and making of recommendations relating to the adjudication of administrative claims filed under 28 U.S.C. § 2672 with the Department which are



Page 1 of Govt's Exh H

- 2 -

based on the activities of employees of the Department of Justice.

2. All Federal Tort Claims pertaining to Department of Justice activities are presented to the Civil Division of the Department of Justice except for claims specifically directed to activities of the Federal Bureau of Investigation, the Bureau of Prisons, the Federal Prisons Industries, the United States Immigration and Naturalization Service, the United States Marshals Service, and the Drug Enforcement Administration.

3. I have caused the appropriate Records Systems within the Civil Division of the Department of Justice to be searched and I have found that there is no record within the Civil Division of an administrative claim being presented to the Civil Division by Rosa M. Flores as is required by 28 U.S.C. § 2675(a).

4. I declare under penalty of perjury that the foregoing is true and correct. Executed on this _13th_ day of November, 2002.

_Aleta Bodolay_
ALETA BODOLAY
Claims Examiner