IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

United States District Court
Southern District of Texas
FILED

SEP 2 6 2003

Michael N. Milby
Clerk of Court

| | | |
|---|---|---|
| ROSA M. FLORES | § § § | |
| VS. | § § | CIVIL ACTION NO. B-02-146 |
| | § § | |
| JAMES W. ZIGLER, Commissioner for the Immigration and Naturalization Service | § § § | |

### PLAINTIFF ROSA M. FLORES' RESPONSE TO DEFENDANT'S MOTION TO DISMISS AND FOR SUMMARY JUDGMENT

TO THE HONORABLE UNITED STATES MAGISTRATE:

**NOW COMES**, Plaintiff, Rosa M. Fores, who files this, her Response to the Defendant's Motion to Dismiss and Motion for Summary Judgment, and in support hereof, Plaintiff would show as follows:

1. Defendant filed a Motion to Dismiss under Fed.R.Civ.P. 12(b)(6) and a Motion for Summary Judgment under Fed.R.Civ.P. 56(e). Both motions should be denied because there are genuine issues of material fact concerning Plaintiff's right to recover under Title VII of the Civil Rights Act of 1964. In particular, Plaintiff would show as follows:

   A. **Legal Standard on a Motion to Dismiss**. A court should only dismiss a suit under Rule 12(b)(6) if it appears beyond doubt that Plaintiff can prove no set of facts in support of her claims that would entitle her to relief. **Conley v. Gibson**, 355 U.S. 41, 45-46, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957). In making this determination, the court accepts as true all allegations contained in Plaintiff's complaint and all reasonable inferences are o be drawn in favor of the Plaintiff's claims. **Bauer v. Texas**, 2003 WL 21752811 (5th Cir 2003).

1

**B. Legal Standard on a Motion for Summary Judgment**. A summary judgment is only appropriate when there are no genuine issues of material fact and, as a matter of law, the moving party is entitled to a summary judgment. **Matshusita Electric Indust. Co., Ltd v. Zenith Radio Corp.**, 475 U.S. 574, 586-87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) and **Celotex Corp v. Catrett**, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). To determine whether there are any material factual issues, the trial court should consult the applicable substantive law to define which issues are material, and then consider the evidence relevant to those issues in the light most favorable to the non-movant. **Williams v. Kaufman County**, 2003 WL 21962582 (5th Cir. 2002).

C. Plaintiff has amended her pleadings in this case to eliminate her state law claims and to assert exclusively claims of sexual discrimination, hostile work environment claims, and retaliation under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §2000e, et. seq. In particular, see 42 U.S.C. §200e-16 (1994). Also see **Chandler v. Roudebush**, 425 U.S. 840, 96 S.Ct. 1949, 48 L.Ed.2d 416 (1976). Plaintiff, as a former federal employee, has a right to bring a sex discrimination cause of action against the Defendant under Title VII of the Civil Rights Act of 1964 and the government has waived its sovereign immunity to such a suit by act of Congress. 42 U.S.C. §200e-16 (1994). See also, **Jurgens v. EEOC**, 660 F.Supp. 1097, 1099-1100 (N.D. Tex. 1987).

**D. Law Regarding Sexual Harassment**. A Plaintiff may establish a violation of Title VII by proving that sex discrimination created a "hostile or abusive working environment." **Shepherd v Comptroller of Public Accounts**, 168 F.3d 871, 873 (5th Cir. 1999). There are five elements necessary to set forth a "hostile work environment" claim: (1) that the employee belongs to a protected class; (2) that the employee was subject to unwelcome sexual harassment; (3) that the harassment was based on sex; (4) that the harassment affected a term, condition, or privilege of

2

employment; and (5) that the employer knew or should have known of the harassment and failed to take prompt remedial action. Id. Hostile work environment claims can be based upon the inappropriate actions of co-workers. **Watts v. Kroger**, 170 F.3d 505, 509, n.3 (5th Cir. 1999). Harassing conduct need not be motivated by sexual desire to support the inference of discrimination on the basis of sex. Harassment need only be directed towards the Plaintiff because of her sex thereby creating a hostile work environment. **Oncale v. Sundowner Offshore Services, Inc.**, 523 U.S. 75, 81, 118 S.Ct. 998, 1002, 140 L.Ed.2d 201 (1998).

**2.** The Plaintiff in this case submits as her summary judgment evidence, and as evidence in support of her opposing to Defendant's Motion to Dismiss, her affidavit, attached hereto as **Exhibit "A"** and incorporated herein by reference for all purposes. Plaintiff's affidavit establishes genuine issues of material fact on each of the elements of a "hostile work environment" claim.

(A) Plaintiff belongs to a protected class. Plaintiff was a female employee subjected to numerous incidents of insults, hostility, false accusations, demeaning treatment, and illegal segregated treatment, all based upon her sex, resulting in her experiencing fear, humiliation, degradation and interference with her ability to perform her job;

(B) Plaintiff was subject to unwelcome sexual harassment. Plaintiff did not invite this hostile treatment. She did what she could to endure the hostile and humiliating treatment by male co-workers and her supervisors did nothing to halt the illegal conduct;

(C) the harassment was based on sex. The harassment was based upon the fact that (1) Plaintiff was a woman and/or (2) that the wrongdoers thought Plaintiff filed a sexual harassment claim at the Border Patrol Academy in South Carolina, a protected right under federal law. Since the wrongdoers focused upon the Plaintiff because of their mistaken belief that she filed a prior

sexual harassment claim while she attended the Border Patrol Academy, there can be no doubt that the wrongdoers based all of their illegal hostilities towards the Plaintiff because she was a woman[1]. The bottom line was that the wrongdoers were openly hostile toward the Plaintiff because they felt that women had no place in the Border Patrol. The wrongdoers openly refused to work with the Plaintiff and the supervisors in charge of the Plaintiff and the wrongdoers did nothing to correct the situation even though they observed these hostilities. Furthermore, when the supervisors did learn of other illegal discrimination that took place outside of their presence, they did not act to cure the situation. The supervisors merely told the Plaintiff that she was "stressed out" and to hang in there because things would get better. These statements clearly establish that the supervisors of the Plaintiff knew of the illegal conduct of male co-workers and chose not to take remedial measures for whatever reasons known only to them;

(D) that the harassment affected a "term, condition, or privilege of employment." The harassment made Plaintiff's work environment miserable, humiliating, and unbearable. Plaintiff ultimately resigned her position because of threats, intimidation and because she saw that the supervisors condoned such illegal conduct through their inaction. As a result, Plaintiff was "constructively discharged" under law when she resigned under the illegal pressures placed upon her by her male co-workers. **Woods v. Delta Beverage Group, Inc.**, 274 F.3d 295, 301 (5th Cir. 2001); and

(E) that the employer knew or should have known of the harassment and failed to take prompt remedial action. The Plaintiff's affidavit presents evidence that the hostility toward her was committed openly by the wrongdoers in front of other co-workers and supervisors. Furthermore,

---

[1] The wrongdoers confused the Plaintiff with another woman trainee who had lodged sexual harassment complaints against her instructor at the Border Patrol Academy in South Carolina.

Plaintiff was frightened by threats of the wrongdoers that they would take care of the Plaintiff "in the field" if she reported their illegal conduct to supervisors. Plaintiff took these threats seriously. She felt that the wrongdoers would carry our their threats if she did complain directly to her supervisors who she believed were close friends to the wrongdoers. Accordingly, she did not complain at first. Instead she endured weeks of hostile treatment hoping that it would eventually go away. Only after weeks of humiliating treatment, frustration and anxiety, did the Plaintiff finally disclose to her supervisors the hostility that she was going through. She cried and pleaded for help but the supervisors in charge of the Plaintiff and the male co-workers at issue chose to ignore the obvious improper conduct by male co-workers.

**3.** The affidavit presented by the Plaintiff (Exhibit "A") offers sufficient evidence the create genuine issues of material fact regarding "hostile work environment," "sex discrimination," "retaliation," and "constructive termination" under law. There exists multiple genuine issues of material fact that must be resolved by the trier of fact. Accordingly, the Defendant's Motion to Dismiss and the Defendant's Motion for Summary Judgment should be denied in all respects.

**WHEREFORE, PREMISES CONSIDERED**, Plaintiff, Rosa M. Flores, respectfully requests that Defendant's Motion to Dismiss and the Defendant's Motion for Summary Judgment should be denied in all respects. Plaintiff further requests such other and further relief that the court deems is just in this matter.

Respectfully submitted,

**LAW OFFICES OF WILLIAM F. KIMBALL**
312 E. Van Buren
Harlingen, Texas 78550
Tel. (956) 425-2000
Fax No. (956) 421-4258

BY: _/s/ William Kimball_
WILLIAM KIMBALL
State Bar No. 11418700
Federal ID No. 6159

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that a true and correct copy of the above and foregoing instrument has been forwarded by United States Certified Mail, Return Receipt Requested, postage prepaid, to: Ms. Nancy Masso, Assistant United States Attorney, 600 East Harrison Street, No. 201, Brownsville, Texas 78520, on this the 26th day of September, 2003.

_/s/ William Kimball_
William Kimball

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | | |
|---|---|---|
| ROSA M. FLORES | § | |
| | § | |
| | § | |
| | § | |
| VS. | § | CIVIL ACTION NO. B-02-146 |
| | § | |
| | § | |
| JAMES W. ZIGLER, Commissioner for | § | |
| the Immigration and Naturalization | § | |
| Service | § | |

### AFFIDAVIT OF ROSA M. FLORES

**BEFORE ME**, the undersigned Notary Public, personally appeared Rosa M. Flores, who under oath sworn, testified as follows:

"My name is Rosa M. Flores and I am over the age of 18 years. I am a resident of Cameron County, Texas. I am the Plaintiff in this lawsuit. I am competent to testify to the facts set forth herein and all facts set forth herein are true and correct and within my personal knowledge."

"I was born and raised in San Benito, Cameron County, Texas. I graduated from San Benito High School in 1988. I worked at Cinemark Theatres in Harlingen from 1986 until 1989 or 1990. I attended one semester at Southmost College in Brownsville in 1989 and then started working full-time as a secretary to the general manager, Peter Osmers, Stankill Corporation, San Benito, Texas. I worked for Stankill Corporation for 2 years until the business failed and dissolved. In 1991 or 1992, I attended Texas State Technical College in Harlingen, Texas, to study computerized bookkeeping and received a certificate in 1993. While going to school, I worked to Gulf Aviation, (David Garza, supervisor), performing bookkeeping duties. I worked for Gulf Aviation from 1992

there were no incidents of sexual discrimination towards me and no hostile work environment directed at me although there was an incident of sexual harassment that I heard about against another female classmate in my class[1]. I got along well with my fellow classmates and instructors."

"After graduation, I started my first day of work on December 4, 2000 at the Weslaco Station. On the first night shift on December 4, 2000, I was assigned to work with Senior Border Patrol Agent, Bobby Gonzalez. He did not want to work with me. He said that he would rather work alone. In any case, after initial problems, I did end up riding with Bobby Gonzalez in his assigned vehicle. After muster, we drove to the Sunrise Café, in Weslaco to eat or have coffee. On the way there, Bobby Gonzalez confronted me while we were alone in the vehicle. He asked me whether I was 'the woman who filed a sexual harassment complaint against my instructor' at the Border Patrol Academy. I said it was not me. He then said that the guys do not want to work with females who file complaints because they are afraid that they will have a complaint filed against them or get written up."

"When we arrived at the café, he told me that I would have to sit separately from the other Border Patrol agents because I was a trainee. This was not a formal Border Patrol rule. It was a rule imposed by Bobby Gonzalez and other male agents working at the Weslaco Station. Bobby Gonzalez sat at one table with approximately nine (9) other male border Patrol Agents. These agents were Hector Zamora, Paul Reece, Edmund Flores, and Mark Joffrey, and other agents who I do not remember at this time. I sat alone at another table near their table. I could hear them talk about me. I heard Bobby Gonzalez say to them that 'she said it was not her.' All of the men were staring at me. I heard Hector Zamora say, "I don't believe her.' These men lowered their voices when they thought I was listening so that I could not hear them, but they continued to stare at me and talk."

"When Bobby Gonzalez and I left the café, we again got into the vehicle and left the Weslaco city limits. Bobby Gonzalez said to me, 'Rosie, I told the guys that it was not you but they still believe that it was you (who filed a previous sexual discrimination complaint at the academy).' We later parked the vehicle on a remote road (at night) and he looked at me, he pointed his finger in my face, and he said to me: 'Let me tell you like it is. We (speaking for himself and the other male border patrol agents at the café) take care of these problems out in the field amongst ourselves. We know who walks into the supervisor's office and for what reasons.' I interpreted this as a threat to

---

[1] There was a Spanish language instructor at the academy named Miguel Lopez, who had a sexual harassment claim filed against him by a fellow female classmate named Christina Vega. I was not in that particular class so I did not witness what had happened to Ms. Vega but after the complaint was filed by Ms. Vega against Mr. Lopez, I did have a Spanish language class with Mr. Lopez. During one class, Mr. Lopez stated (and he was looking at me as the only female in the class), "If any of you give me any problems or trouble, I will have you taken care of. I have friends in all the stations you are going back to." I did take this statement as a threat but I did not have sexual discrimination problems with Mr Lopez so I dismissed the threat as harmless in my own mind. I later had to deal with the fact that my fellow male agents at the Weslaco station somehow believed that it was me who filed the sexual harassment claim against Miguel Lopez. My classmates who witnesses Mr. Lopez' conduct toward Ms. Vega told me that her complaints were justified and true. I kept this to myself throughout my employment at the Weslaco station. One fellow worker at the Weslaco station told me that the rumor was started by Miguel Lopez himself and that he was a good friend of one of the agents who harassed me.

2

my safety. I believed what he was telling me that if I ever made a complaint to my supervisor about a fellow male border patrol agent, that I would be in physical danger out in the field and that a male border patrol agent would either harm me or not come to my aid if I was in danger. I was terrified by this threat. Bobby Gonzalez then went to sleep for 6 hours. He told me before going to sleep to keep an outlook for illegal aliens. This was my first day on the job for the United States Border Patrol."

"On my second day of employment (December 5, 2000) with the United States Border Patrol, (night shift), I attended muster at 10 p.m. Another unwritten rule of the local male agents was that if you were late for muster, you had to work with the 'girl.' Paul Reece came in late and agent, Hector Zamora yelled out 'you're late, you get the girl.' Agent Reece looked shocked. We got in the vehicle and started driving to the Sunrise Café. Agent Reece then started pointing his finger in my face (just like Bobby Gonzalez) and he said to me, "I heard you are the girl that filed a complaint against your instructor at the academy.' I said, 'no it wasn't me, it was Mrs. Vega and she did not make it through graduation.' He then said, 'we heard it was you and we were told about you before you even got here.' Again I denied it was me. He then said 'Let me tell you that these guys do not want to work with you because they do not want to work with girls who file complaints. They are afraid you will file against them or have them written up. Again, I said, "I did not file against anyone." When we got to the café, he said to me, 'you have got to sit at a separate table.' I said, 'I know. Bobby already told me yesterday .' He said, 'good.'" After again sitting at a separate table while the other male border patrol agents sat and ate together, we left the Sunrise Café. Agent Reece then drove me out to a remote location. He then again pointed his finger in my face and said: 'I don't know if it was you or not, but let me tell you we take care of problems amongst ourselves in the field and we know who goes to the supervisor's office and for what. You do not want to be seen in a supervisor's office. Me personally, from time to time, I will cuss. You will just have to get used to it. You need to realize the position you are in now and you are with a lot of guys and guys cuss.' I interpreted this message as a threat of physical harm. I felt that if I was even seen in the supervisor's office that I would be in physical danger."

"Later this same evening, after the apprehension and booking of two illegal aliens, Agent Reece and I were sent back into a remote area to back up agent Mark Joffrey. We arrived and after a search of the area, it was determined that there were no illegal aliens in this area and agent Reece and agent Joffrey decided to leave this area to go back to their assigned areas. As I was watching agent Joffrey back up his vehicle to get onto the road (approximately 20 yards away), agent Reece said to me: 'there goes your ride, go catch it.' I said to agent Reece, 'you are my journeyman tonight. What I understand is where you go, I go.' Reece said: "No. go catch your ride,' pointing his finger at agent Joffrey's vehicle. So I went running after agent Joffrey yelling 'stop' and waiving to him to stop. He stopped his vehicle, rolled down his window, and said, 'what do you want.' His tone was hostile. I said 'you are my ride.' Joffrey said 'No, I am not. That is your journeyman pointing at Reece. You go where he goes.' I said, "he said (Reece) for me to go catch my ride with you. You are the only other vehicle here. Let me get my back pack.' Agent Joffrey then waited for me to get my backpack from Agent Reece's vehicle. I got in Joffrey's vehicle. When I got into

3

Joffrey's vehicle and he was visibly angry[2]. He did not speak to me for about 5 minutes. He then called agent Reece on his cell phone upon entering the city limits of Weslaco. He said, in my presence, to agent Reece: 'I am going back and you have got her.' He then hung up. He then turned the vehicle around and started driving back to the area we had previously left. He then said to me, 'We are going back and you are staying with your journeyman.' Agent Joffrey then dropped me off in a remote brushy area, alone, (at night, approximately 3 a.m.) and agent Joffrey told me to go find Agent Reece. I could see Agent Reece's vehicle but I did not know where he was. Agent Joffrey then drove away. I found Agent Reece about 5 minutes later and he appeared angry that I was sent back. He then said to me, 'the next time I tell you to go with someone and stay with him, you better do it.' These are the significant events on my second day as a United States Border Parol Agent."

"This discriminatory behavior towards me, as demonstrated by Border Patrol Agents Gonzalez, Zamora, Reece, and Joffrey, above, continued throughout my employment as a Border Patrol Agent at the Weslaco Station. In nearly every muster before my shift, and on nearly every day of my employment, I would hear comments like 'I do not want to work with that girl' or 'you are late, so you get the girl' or 'I am not going to work with an EEOC liability.' I was made to feel like I was a second class citizen and worthless. Many of these comments were made out loud, in my presence and in the presence of supervisors, including Don Louck. In no case were the agents who made these highly offensive comments reprimanded or disciplined by the supervisors. I felt that the supervisors were too close personally with agents Gonzalez, Reece, Joffrey, Zamora and the other male agents who harassed me. I believed that their discriminatory actions toward me were condoned and approved by the supervisors and management of the Weslaco Station. I also believed (because of the statements made by agent Reece that 'we know who goes to the supervisor's office and for what') that if I were to complain to my supervisors about agents Gonzalez, Reece, Joffrey, and Zamora, that the supervisors would, in turn, tell agents Gonzalez, Reece, Joffrey and Zamora about my complaints and I would face danger in the field thereafter. I feared for my safety because I was threatened by agents Gonzalez and Reece and that is why I did not submit a formal complaint to my immediate supervisors."

"I spoke with my husband, who worked at the Harlingen Border Patrol station about my problems on or about the third week of December 2000 and asked him to speak to his supervisors about my situation due to the fact that I was too afraid to approach my own supervisors in Weslaco. My husband spoke to supervisors Rene Zamora, Ruben Torres, and Eddie Gonzalez and they told him to tell me that I needed to 'suck it up' and that this is the way the Border Patrol treats female agents.

"On or about my tenth day of work, I was assigned to ride with agent Rogelio Cervantes. After muster, and after I serviced the vehicle for the night shift, I went to look for Agent Cervantes. When I found him, in the hallway of the station. He told me that: "I will not ride with an EEOC liability for 8-10 hours." He refused to go to the vehicle with me and he walked away from me. I

---

[2] He had the front seat and the floor in front of me filled with his personal belongings and he did not have the courtesy to move any these items so that I could be comfortable or even utilize my seatbelt. He was so angry that I was too intimidated to move these items. I sat with my knees in my chest in a very crowded condition.

then went into the woman's restroom and began to cry. I could not handle the disrespect and outright discrimination by fellow male Border Patrol agents any longer. After I composed myself, I left the women's restroom and in the hallway, I met my supervisor, Don Louck. He said 'Rosa, why are you still here.' I said: 'My journeyman will not get in the vehicle with me. He does not want to ride with an EEOC liability for 8-10 hours.' I also said, 'I need to talk to you.' Don Louck then stated to me, 'Don't worry Rosa, it is only going to get better.' He put his hands in the air like he could not help me and then he walked away to call another female agent for me to ride with. Agent Rudy Moreno then walked in and he volunteered to have me ride with him. He appeared to be disgusted with his fellow male agents. At this point in time, I realized that Don Louck would not help me because he was too close personally to the agents who were discriminating against me. His statement showed that he knew of the discrimination that I was enduring but that he just wanted me to wait in the hope it would get better."

"During the third week of December, I met with my post academy instructor, who I looked up to as a supervisor of mine, Michael Egerton. I told him that day, during our lunch break, every detail as to what was happening to me at the Weslaco Station. Egerton told me that he had a psychology degree and that I was 'overwhelmed.' He said: 'In time, it will get better. Egerton did not report my complaints to higher management nor did he act to correct the problem. I later found out that Egerton was best friends with Bobby Gonzalez and that Egerton's own wedding was at Bobby Gonzalez' home. I also was told by a co-worker at a later date that Egerton did not have a psychology degree."

"I endured continuous discrimination like the behavior outlined above, until January 10, 2001, when I tendered by resignation to Patrol Agent in Charge, John A. Lopez. Egerton was with me when I resigned. Agent Lopez immediately asked me 'O.K., who said what or who did what to you?' I started crying and said "Sir, nobody did anything to me. This is just not my job.' This was a lie. I dreamed of this job. I was simply afraid of what would happen to me if I told the truth. I was still remembering the prior threats made against me by agents Gonzalez and Reece. Agent Lopez asked me if my partner was being threatened with a gun, what would I do. I said I would shoot the person threatening my partner and that I would lay down my life for a partner. He said, 'that is all I need to hear,' and he told Egerton to take me to the Port of Entry in Progresso, Texas, to see if I could be reassigned to immigration. Egerton never stated to Lopez that I was a victim of sex discrimination during this meeting. After the meeting, Egerton drove me to Progresso and during the ride said to me, "what is really going on, why are you resigning?' I was shocked because I already told him the details during the third week of December. I said, 'You know why. I told you the details and I cannot put up with this abuse any longer. I am losing my mind and I told you what happened because I trusted you. You have not done anything to help me. Even my husband has asked his supervisors and they couldn't help me.' Egerton then said 'lets go see Mr. Vargas (the man in charge of the Port of Entry), and see if he can get you a job. ' I was not interested in working for immigration. I wanted my job at Border Patrol but I could no longer endure the threats and discrimination."

*signature: Rosa M. Flores*

Rosa M. Flores

STATE OF TEXAS §
§
COUNTY OF CAMERON §

SIGNED AND SWORN TO BEFORE ME, under oath on this __7th__ day of August, 2003.



*signature: Peggy L. Morriss*

Notary Public in and for the State of Texas

My Commission expires on _____.